IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 27, 2004

## STATE OF TENNESSEE v. GEORGE A. JOHNSON

**Direct Appeal from the Circuit Court for Sevier County**
**No. 9359    Rex Henry Ogle, Judge**

---

**No. E2003-02881-CCA-R3-CD - Filed January 31, 2005**

---

The defendant, George A. Johnson, was convicted of rape, a Class B felony, and statutory rape, a Class E felony, and was sentenced as a Range II, multiple offender to twenty years at 100% in the Department of Correction for the rape conviction and four years at 35% for the statutory rape conviction, to be served concurrently.[1]  Additionally, both sentences were to be served consecutively to the remainder of a three-year sentence for attempted aggravated sexual battery for which the defendant's probation was revoked as a result of the convictions currently on appeal.  On appeal, the defendant raises the following issues:  (1) whether the evidence was sufficient to sustain his convictions; and (2) whether the trial court erred in not suppressing his confession, imposing the maximum sentence, and not allowing the defendant to impeach the victim with a prior inconsistent statement.  Based on our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JERRY L. SMITH and J. C. McLIN, JJ., joined.

Micaela Burnham, Assistant Public Defender, for the appellant, George A. Johnson.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; Al C. Schmutzer, Jr., District Attorney General; and Steven R. Hawkins, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

---

[1]This court ordered supplemental briefing on the question of whether a criminal defendant may be convicted of both a forcible rape and a consensual statutory rape from conduct arising out of a single episode of sexual activity. The parties have briefed their respective positions on this question.  However, upon further review of the record in this case, we find the record is simply inadequate for full review of this issue and we will not address it.

The victim, S.N.,[2] who was fifteen years old at the time of trial in September 2003, testified that the defendant is married to her aunt. In April 2002, she went to the defendant's apartment to spend the night with the defendant's daughter, C.J. While C.J. was asleep on the top bunk, and S.N. was asleep on the bottom bunk, S.N. awoke because the defendant was beside the bed touching her vagina with his "finger and his tongue." Asked if his finger went inside of her, S.N. responded, "Yes." She said the defendant pulled down her pajamas, although she "told him not to." S.N. did not "holler" for her aunt because she was scared she "would get in trouble." She also responded affirmatively when asked if the defendant put his tongue in her vagina. When she got home the next day, she did not tell her mother because she was scared she would get in trouble, but when her mother asked her "some days" later if the defendant had "touched anything," S.N. "cried" and told her mother what had happened. She related that until the rape, she liked her uncle and had no problems with him in the past.

On cross-examination, S.N. testified that she was wearing "regular pajamas" which the defendant pulled down "a little to [her] knees." He pulled her legs apart and did not say anything during the encounter. When defense counsel asked S.N. if she "ever threatened to make accusations like these against anybody else," the transcript reflects her response was indiscernible. She acknowledged knowing a "Mr. Ireland," but answered, "No" when asked if she remembered telling him she would get him in trouble. Asked if she attempted to push the defendant's hand away, S.N. answered, "One time."

Julia Edney, the victim's mother, testified that S.N. has "ADHD, which means she's a little slow as far as picking up work" and that although S.N. was in the ninth grade, most of her schoolwork was on the fifth grade level. She said her daughter was thirteen years old in April 2002 and had occasionally spent the night at the defendant's apartment, doing so in April 2002. Sometime after the rape, Edney confronted her daughter and asked her if the defendant "had ever touched her." S.N. "got all quiet and started crying." Edney stated the school counselor "had already turned it in," and both she and S.N. talked to the police and the Department of Human Services ("DHS"). On cross-examination, she denied that S.N. had accused someone of a similar offense a few years before.

Detective Sam Henson of the Sevierville Police Department met with S.N., her mother, and a DHS representative in June 2002 to discuss the rape. He also questioned the defendant on three separate occasions. After the second meeting, the defendant "indicated he needed to relate some information . . ., and that he would be back." The defendant voluntarily returned for a third meeting and gave an incriminating statement, which was tape-recorded. The audiotape was played in court and entered into evidence, along with a typed transcript of the interview. Detective Henson testified that the defendant was advised of his Miranda rights and signed an admonition and waiver form, which was also entered into evidence,[3] at the third meeting on June 27, 2002. After the third

[2]It is the policy of this court to identify victims of sexual abuse by their initials only.

[3]Because the defendant's admissions were the subject of a pretrial motion to suppress and are one of the issues on appeal, we will review them in more detail in our analysis.

meeting, the defendant was not arrested, but was allowed to leave so that he could "finish out his pay period so that he could get his paycheck and give it to his wife . . . ." According to Detective Henson, the defendant was not a "flight risk," and S.N. was being kept away from the defendant and was therefore not in danger. The defendant was arrested later on the rape charges. On cross-examination, Detective Henson said that the defendant denied the rape allegations at the first two meetings. At the third meeting, the defendant related to Detective Henson that he was concerned about his family's financial situation.

Testifying for the defense, Leon Ireland identified himself as the defendant's brother-in-law and the victim's uncle. Asked about the victim's reputation for honesty or dishonesty, Ireland stated, "Well, I guess generally, in my opinion, she's not been the most honest person to me. But then I can't speak for everybody else." On cross-examination, he acknowledged that he had no direct knowledge of what transpired between the defendant and the victim the night of the rape.

Patricia Johnson, the defendant's wife, testified that the victim, her niece, visited her home "two to three times a month during the summer" and often spent the night. She acknowledged that the victim had spent the night in her home on more than one occasion in April 2002. On the night of the rape, Johnson did not recall hearing or being awakened by any sort of noises. The morning after the rape, S.N. did not act differently toward the defendant or say anything to Johnson about the incident. Johnson also testified that if her husband had gotten up during the night, she would have awakened.

The defendant testified he never went into the bedroom where S.N. was sleeping at night. He also denied removing her clothing, touching her vagina, or performing oral sex on her. Asked to explain why the victim made these allegations, the defendant stated, "Well, I told her she couldn't go in me [sic] and my wife's bedroom to watch TV anymore because I found her going through things on my wife's side of the bed" about a week before the incident. The defendant admitted making a statement to the police but said it was not a true statement. He explained that he was pressured into making a statement to Detective Henson:

> Q. Please explain why you made that statement.
>
> A. I was told on the third occasion that I went down there, and this was in the training room where there's no recording devices or TV cameras or anything, that if I didn't cooperate he was going to come down like a ton of bricks and I would go to the slammer.
>
> Q. Okay. By "cooperate," what did you take that to mean?
>
> A. That means I make a statement here and now or else.
>
> Q. And did you talk to the detective about the need for you to work?

-3-

A.      Yes, ma'am.

Q.      And when did that conversation occur?

A.      In the training room.

Q.      Did it occur before or after you made your statement?

A.      Before.

Q.      So you told him you are needing to get out and work, take care of your family, before you made your statement?

A.      Yes, ma'am.

Q.      And did he say anything in response to that?

A.      He said I could make a statement now or I could go to jail.

Q.      So you believed that if you didn't make a statement you would be arrested immediately.

A.      Yes, ma'am.

On cross-examination, the defendant acknowledged being advised of his "rights" and to signing waiver forms before being questioned the first two times by Detective Henson and that he denied during those two interviews that the incident occurred. He admitted that the voice on the audiotape of the third meeting was his and he had told Detective Henson that he touched the victim's vagina. However, he testified that the statement was untruthful and the questions were "specifically tailored . . . in a way where I was to answer them in order for him to garner the information he needed for a conviction." The defendant said he gave a confession out of "fear for [his] family."

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant argues that the evidence presented at trial was insufficient to support his convictions for rape and statutory rape. He asserts that S.N's testimony was false because she testified that he pulled her pajamas to her knees and spread her legs apart, but that it is "physically impossible to spread someone's legs apart when pants are down only to the knees." He also asserts that because S.N. testified that the rape occurred on the bed, and the defendant told police that it occurred on the sofa, his statement to police "in no way" corroborated the allegations made by the

victim at trial. These "problems" with the evidence, according to the defendant, are "so severe as to taint the final verdict in this case."

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Tennessee Code Annotated section 39-13-503(a) defines rape as the following:

> Rape is unlawful sexual penetration of a victim by the defendant or of the defendant by a victim accompanied by any of the following circumstances:
>
> (1) Force or coercion is used to accomplish the act;
>
> (2) The sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent;

(3) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; or

(4) The sexual penetration is accomplished by fraud.

Tenn. Code Ann. § 39-13-503(a) (1997). Rape is a Class B felony. Id. § 39-13-503(b).

Statutory rape, a Class E felony, is "sexual penetration of a victim by the defendant or of the defendant by the victim when the victim is at least thirteen (13) but less than eighteen (18) years of age and the defendant is at least four (4) years older than the victim." Tenn. Code Ann. § 39-13-506 (a), (c).

Taken in the light most favorable to the State, the proof showed that the forty-eight-year-old defendant penetrated the thirteen-year-old victim's vagina with his finger. The victim testified that he came into the bedroom where she was sleeping, pulled her pajamas down to her knees, and penetrated her vagina with his finger and tongue although she told him not to do so. She did not tell her aunt what he had done because of fear she "would get in trouble." She said she tried to push his hand away. Detective Henson testified that the defendant admitted he penetrated the victim with his finger, and the audiotape of that admission was played for the jury and a typed transcript was also entered into evidence. Although the defendant denied committing these acts, the jury, as the trier of fact, obviously resolved the conflicts in the testimony against the defendant. We conclude the evidence was sufficient for a rational jury to find the defendant guilty of the essential elements of rape and statutory rape beyond a reasonable doubt.

## II. Suppression of Confession

In his motion for new trial, the defendant asserted that his confession to the police was coerced and should have been suppressed. In his appellate brief, he asserts that he was in custody during the third interview when he made incriminating statements and that his confession was involuntary because "there was a *quid pro quo* that the defendant make the statement that the officer wanted in exchange for being allowed to leave and turn himself in later, and no retaliation being taken against his family." The State responds that the defendant was read his Miranda rights before each of the three interviews and each time voluntarily and knowingly signed a waiver of those rights.

In Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694, 706 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." The privilege against self-incrimination is spelled out in the text of the Fifth Amendment, which states that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Where an "interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that

the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Miranda, 384 U.S. at 475, 86 S. Ct. at 1628, 16 L. Ed. 2d at 724 (citing Escobedo v. Illinois, 378 U.S. 478, 490 n.14, 84 S. Ct. 1758, 12 L. Ed. 2d 977 (1964)). The Court explained that "[t]he requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." Id. at 476, 86 S. Ct. at 1629, 16 L. Ed. 2d at 725.

Article I, section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Whether a waiver of this right is voluntarily, knowingly, and intelligently made is determined by the totality of the circumstances under which the rights were waived. See State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998). However, this court has stated that a court may not conclude that a defendant's confession was constitutionally involuntary based on the defendant's "'subjective perception'" that it was involuntarily obtained. State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996)).

Detective Henson testified at the suppression hearing that the victim identified the defendant as the person who raped her. He said the defendant voluntarily spoke to him on three separate occasions and, on each, was advised of his Miranda rights, signed a waiver form, and gave a statement to the police. After the third interview, the defendant was allowed to leave. He denied telling the defendant he would lose custody of his children if he did not make a statement or that the defendant told him he felt pressured to make a statement.

The defendant testified he went to the police station voluntarily and cooperated with the police three times. Asked what was different about the third interview, the defendant recited what Detective Henson allegedly told him:

> And he said that, "I've got to have a statement today one way or the other." And he said, "It's like this, just on your past record you can lose your kids. One of the police officers here is your landlord. You know what can happen there." And he said that, "This is your one and only chance. And if you don't do it, I'm going to come at you with everything there is."

Asked by the trial court if Detective Henson "advise[d] him of his constitutional rights each and every time," the defendant responded affirmatively. He acknowledged that he signed a waiver of rights at all three interviews, but said the copy of the third one was not the one he signed. He said he underlined the word "duress" on the form he signed at the third interview and, because that interview was taped, "I made like I was going to cough, but what I did is I went, 'Duress,' hoping it was caught on tape. He asked me what I said and I just brushed it off." Defense counsel asked, "[Y]ou're not denying that he did read you the Miranda rights and you did sign," and the defendant responded, "No, I'm not denying that at all."

The trial court denied the motion to suppress, finding that the defendant had been advised of his <u>Miranda</u> rights prior to making the statement and that it was free and voluntary:

> Based upon the testimony that the Court has heard as it relates to the statement of June 27th of '03, the Court finds that the statements were given – the statement in question was given after being advised of his constitutional rights. . . .
>
> The Defendant says that he made statements saying that the statement was given under duress. That he said that on the tape and so forth. Quite candidly, the tape is very clear. There is nothing in this tape that even hints that this Defendant said the words "duress." There is no hint on this taped interview that the Defendant was, in fact, under duress, other than maybe the fact that he was confessing to a very serious crime.
>
> It is obvious that the copy of the advice of rights that has been signed on 6/27/03 is somewhat different than the other two. There isn't any question about that. Have no question about that. But that could be done for any number of reasons that – as far as people filling out their own forms as such. I don't know. I have no explanation for that.
>
> But the issue before this Court at this time is whether or not the Defendant gave the statement after being fully advised of his constitutional rights, and was the statement free and voluntary. And the Court must find the answer to be "yes" on all of those questions.

We review the trial court's denial of the defendant's motion to suppress by the following well-established standard:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, the trial court's application of law to the facts, as a matter of law, is reviewed *de novo*, with no presumption of correctness. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000). This court may consider the proof at trial, as well as at the suppression hearing, when considering the appropriateness of the trial court's ruling on a pretrial motion to suppress. See State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998) (holding that because the Tennessee Rules of Appellate Procedure "contemplate that allegations of error should be evaluated in light of the entire record," an appellate court "may consider the proof adduced both at the suppression hearing and at trial").

The record on appeal does not contain the audiotape of the defendant's confession, the typed transcript of the confession, or the three waiver of rights forms signed by the defendant. Accordingly, our review will be based upon the transcripts of the suppression hearing and the trial testimony.

In ruling on the motion to suppress, the trial court credited Detective Henson's testimony, rather than that of the defendant. Based upon our review of the testimony at the suppression hearing and at trial, we conclude the record supports the trial court's determination that the confession was voluntary and uncoerced, therefore allowing it to be admitted at trial.

### III. Sentencing

The defendant contends the trial court erred in imposing a twenty-year sentence on the rape conviction, the maximum allowed by statute. More specifically, the defendant asserts that the sentence was "excessive" and the trial judge was "prejudiced against the defendant" because the judge stated at the sentencing hearing that the defendant was a "pedophile" and his testimony was "obviously fraudulent and false." The State responds that the trial court properly sentenced the defendant within the statutory range based on applicable enhancement factors.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2003), Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

Testifying for the State at the sentencing hearing, the victim's mother, Julia Edney, said that she had been told that another sexual encounter between the victim and the defendant had occurred in Florida. As a result of the rape, the victim was still receiving counseling, was unable to "get close to people," and did not trust men.

On the defendant's behalf, Patricia Johnson testified that he had always "tried to do his best to take care of what needs to be taken care of" and had "always seen to it that we have what we needed." She considered him a good husband and a good father. The defendant told her his polygraph was "inconclusive" concerning the rape; and, after the third interview with the police, he said the officer allowed him to leave in order to provide for his family before he turned himself in.

The State and the defendant agreed that he qualified as a Range II, multiple offender under Tennessee Code Annotated section 40-35-106. As to enhancement factors, the defendant admitted to being in a "position of trust" and on probation release status, for purposes of Tennessee Code Annotated section 40-35-114(14) and (16) (2003). The defendant challenged the State's contention that he had a "previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range" under Tennessee Code Annotated section 40-35-114(2) (2003), arguing that the court did not have "a sufficient amount of facts" from the presentence report concerning these prior convictions to satisfy the statute. As to criminal behavior, the defendant contended that he "repudiated" at trial his confession to police that more than one incident occurred between him and the victim. The State responded by reading back to the court portions of the taped confession:

> [THE STATE]: . . . Officer Henson asked him, "Okay, how many times did that happen? Was that an isolated incident, or it happened on more than one occasion?"
>
> "It just happened twice."
>
> "Both of those times in April?"

"Yeah."

Applying these enhancement factors, the trial court sentenced the defendant to the maximum within Range II, twenty years, for a Class B felony:

> What is justice in this case? Obviously the trial court has to follow the sentencing guidelines. He is a range 12 to 20. He is because he is Range 2. He has previous sexual offenses in this and other states.
>
> The bottom line is this man is a pedophile. And in addition to this particular incident for which he was found guilty by this jury, he admitted in his investigation to the officer that there was another incident that took place.
>
> So the Court finds that there is other criminal behavior in addition to those necessary to establish the appropriate range. He admitted to that. Secondly, the Court finds that . . . this felony was committed while he was on release status in this community, in that he was on probation from a previous conviction of this court. And that the Defendant abused a position of private trust, in that this child had been placed in the care of this Defendant and his wife for babysitting. Not babysitting but child-sitting. And he did these acts while the child was in his custody and care.
>
> And I would have to say that this Court sat here through motion hearings and other hearings and listened to this Defendant. And I'll be quite candid. This is the – his testimony was the most convoluted and obviously fraudulent and false testimony that this Court had heard in a long time. There was not even a semblance of truth.
>
> And we have – the motion hearings this Defendant testified that he – that he was forced to say things, that he was forced to do this. And then he would say things, like, under his breath. And I remember specifically asking this Defendant, "Is that on that tape?"
>
> And he said, "Sure it is." Well, we listened to the tape and there wasn't anything on that tape. This man flat-out lied throughout the trial of this case, and nothing that he said was true. And he knew he was facing a very serious sentence. I understand all that. But – and the allegations of misconduct that he made on this officer just added to the fact that you cannot believe a word this man said. He is not worthy of any belief at all. As I said before is a medical – or euphemism or whatever on other people, but I wouldn't believe this

-11-

man on a stack of Bibles as high as a cupola of the Sevier County Courthouse.

And so the Court has found the enhancing factors that I found. I have been presented no evidence of any mitigating factors that apply in this case. And especially his abuse of trust, and the fact that he was on release status in this community. And from the totality of the circumstances, the Court feels like that the maximum sentence of 20 years not only is justified, that it is well-earned by this Defendant.

The defendant was convicted of rape, a Class B felony, and statutory rape, a Class E felony. The sentence range for a Class B felony, as a Range II, multiple offender, is twelve to twenty years. Tenn. Code Ann. § 40-35-112(b)(2) (2003). In determining the appropriate sentence for a felony conviction, the sentencing court, if there are enhancement factors but no mitigating factors, may set the sentence above the minimum in that range but still within the range. See Tenn. Code Ann. § 40-35-210(d) (2003); State v. Boggs, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996). There is no mathematical formula of evaluating the enhancement factors to calculate the appropriate sentence. See generally Boggs, 932 S.W.2d at 475. "Rather, the weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record." Id. at 475-76 (citations omitted).

The trial court applied enhancement factors (2), (14), and (16) in enhancing the defendant's sentence to twenty years. See Tenn. Code Ann. § 40-35-114(2), (14), (16) (2003). The trial court found no mitigating factors, and the record does not contain a request for the application of mitigating factors. The record clearly supports the trial court's application of enhancement factors (14) and (16) because the defendant admitted to their application. As to enhancement factor (2), the presentence report shows that the defendant was convicted in Arizona in 1975 of rape, aggravated battery, and kidnapping of a minor. All three of these offenses occurred on the same date, July 11, 1974. He also pled guilty to attempted aggravated sexual battery in Sevier County, Tennessee, in 2000, the conviction for which he was on probation at the time of the present rape. Additionally, the defendant admitted that factors (14) and (16) were applicable. Accordingly, we conclude there were sufficient enhancement factors for the trial court, in its discretion, to sentence the defendant to the maximum within the range.[4]

---

[4]We note that under Tennessee Code Annotated section 40-35-106(b)(4), the defendant's three convictions in Arizona could possibly be considered one conviction if they were part of a "single course of conduct;" however, the statute also mandates that "acts resulting in bodily injury or threatened bodily injury to the victim or victims shall not be construed to be a single course of conduct." Certainly rape, kidnapping a minor, and aggravated battery plausibly could have been acts resulting in bodily injury or threatened bodily injury, and thus three distinct convictions for purposes of sentencing. However, because the record is incomplete in this regard, and the trial court did not base its sentencing decision solely on the resolution of this issue, we need not address it.

The defendant's brief in this matter was filed prior to the release of Blakely v. Washington, 542 U.S. ___, 124 S. Ct. 2531 (2004). The State argues that Blakely does not affect the defendant's sentencing because it continues to permit application of enhancement factor (2), prior convictions, which the record shows the defendant has; and, he admitted the applicability of factor (16), abuse of a position of trust, and he was on probation at the time of the present offenses, factor (14). The Supreme Court in Blakely clarified its earlier holding in Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63 (2000), holding that "[o]ur precedents make clear . . . that the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." Blakely, 542 U.S. at __, 124 S. Ct. at 2537. Accordingly, we agree with the State's position that Blakely does not affect the defendant's sentencing. The record supports the trial court's sentencing of the defendant.

## IV. Impeachment of Victim

Finally, the defendant contends the trial court erred in not allowing impeachment of the victim's testimony as to threats she allegedly made toward a witness, Leon Ireland, "falsely accusing him of sexual abuse." The defendant contends that the victim lied in her trial testimony as to whether she ever made such statements, and therefore, by his argument, he "should have been allowed to enter extrinsic evidence that [the victim] did make such a statement through two witnesses who heard it." The only information as to this statement is defense counsel's relating to the trial court that a witness who was present but not called, apparently as the result of the court's ruling on this matter, would testify that she overheard the victim say, "'If you don't leave me alone, you'll be in the jailhouse like . . .' and then she shut up." Apparently, the record does not reveal when or where the victim allegedly made this statement, and it is unclear why, supposedly, it was made to defense witness Leon Ireland, since he was not asked about it in his testimony. Since the defendant did not raise this issue in his motion for new trial, it has been waived, for purposes of appeal. See Fahey v. Eldridge, 46 S.W.3d 138 (Tenn. 2001); State v. Baker, 785 S.W.2d 132 (Tenn. Crim. App. 1989).

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE